**06  CV  15400**

OSEN & ASSOCIATE, LLC
Joshua D. Glatter (JG-0184)
Gary M. Osen (GO-5790)
700 Kinderkamack Road
Suite 200
Oradell, NJ  07649
Tel. (201) 265-6400

**[Additional counsel on signature page]**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
**HANA AHMED KARIM, RANJDAR MUSTAFA HASAN, REBAR JAHUR ISMAIL, HERISH SAID ALI, KARZAN SHERKO TOFIA, FARHAD M. MURASL, and HERISH HASSAN YOUSIF,** on behalf of themselves and others similarly situated,

                **Plaintiffs,**

            **v.**

**AWB LIMITED, and BNP PARIBAS,**

               **Defendants.**
--------------------------------------------------------X

                        **JURY TRIAL DEMANDED**

## RICO CLASS ACTION COMPLAINT

## INTRODUCTION AND SUMMARY

1.     This is a class action brought by plaintiffs under 18 U.S.C. §§ 1962(c), (d) and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") involving the following predicate acts under RICO: (a) 18 U.S.C. § 1952 (Travel Act); (b) 18 U.S.C. § 1956 (money laundering); (c) 18 U.S.C. § 1957 (monetary transactions involving unlawfully derived property); (d) 15 U.S.C. §§ 78dd-1 *et seq.* (Foreign Corrupt Practices Act); and (e) 50 U.S.C. §

1701 *et seq.* (International Emergency Economic Powers Act) ("IEEPA"), including violations of 31 C.F.R. Part 575 (Iraqi Sanctions Regulations).

2.     This action is brought on behalf of a class (the "Class") of Northern Iraqi citizens who were specific intended beneficiaries of humanitarian benefits under the United Nations ("UN") Oil-For-Food-Programme (the "Programme"), which was enacted pursuant to UN Security Council Resolution 986.

3.     Specifically, the Class consists of Iraqi citizens from the three northern governorates of Arbil, Dihouk and Suleimaniyeh who qualified to receive Programme benefits but did not receive the full benefits to which they were entitled.

4.     Class members' injuries were proximately caused by defendants' illegal conduct, which, as alleged herein, consisted of paying secret kickbacks to Iraq in contravention of U.S. money laundering statutes, bribery of foreign officials in violation of U.S. law concerning foreign corrupt practices, trade with the Iraqi government in contravention of U.S. Presidential orders, and direct violation of UN Security Council resolutions that the United States was obligated to comply with.

5.     Individually and collectively, defendants committed numerous predicate acts as defined by the RICO statute.

6.     The Programme, one of the largest humanitarian relief efforts ever undertaken in the history of the UN, authorized the sale of Iraqi oil to qualified buyers and the purchase of humanitarian goods with the proceeds from such oil sales. The Programme was specifically established by the UN to provide Iraqis - including Class members - with vital goods and services that had been largely unavailable to them as a result of economic sanctions the UN imposed on Iraq after Iraq's invasion of Kuwait in 1990.

7.     The Programme, which ran from December 10, 1996 through June 3, 2003, was divided into thirteen phases, each lasting approximately 180 days.

8.     Defendant BNP Paribas ("BNP"), one of the most prominent banks in Europe, was appointed by the UN to serve as agent for, and control, the Programme's escrow account (the "Escrow Account"). The Escrow Account received the oil sale proceeds and remitted payment for the purchase of humanitarian goods supplies.

9.     As alleged in detail below, under the Programme, BNP facilitated payments for humanitarian goods suppliers (via letters of credit) through the Escrow Account, approved letters of credit for purchase of Iraqi oil, and issued its own letters of credit for oil purchases.

10.    Defendant AWB Limited ("AWB"), formerly known as the Australian Wheat Board, is the exclusive marketer and manager of all Australian bulk wheat exports. AWB was the largest humanitarian goods provider under the Programme and participated in every one of its phases.

11.    Despite the charitable objectives underlying the Programme, which was created expressly to benefit, *inter alia*, the Class, Class members were victimized by defendants' perpetration of a criminal scheme and conspiracy that deprived them of the benefits to which they were entitled.

12.    During the period from June 10, 1999 to June 3, 2003 (the "Class Period"), defendants conspired to deprive the Class members of the value of the goods they were supposed to receive under the Programme. In so doing, defendants subverted the Programme and caused injury to plaintiffs and the Class.

13.    Defendants stole from the Class by engaging in a brazen kickback scheme (the "Kickback Scheme"), in which Escrow Account funds earmarked for the benefit of, *inter alia*,

the Class, were instead illegally siphoned from the Escrow Account and improperly transferred into the coffers of Saddam Hussein's corrupt Iraqi regime ("Hussein Regime") or used to indemnify goods suppliers, including AWB, for the bribes they had paid to Iraq.

14.   AWB and BNP knew, or recklessly disregarded, that the funds were being paid to the Hussein Regime in contravention of UN authorization required under the Programme, and in further contravention of U.S. law concerning trade with Iraq. However, intending to reap the benefits of profitable participation in the Programme, defendants chose to disguise and misrepresent the kickbacks to make them appear to be legitimate costs for Programme contracts.

15.   As described herein, sworn testimony from former senior executives at AWB makes clear that AWB knew that it was clandestinely paying illegal bribes to the Hussein Regime, and that it did so in order to continue to receive profitable contracts from Iraq.

16.   During the Class Period, Iraq conditioned AWB's Programme contracts upon AWB's willingness to pay the Hussein Regime illegal kickbacks. AWB knowingly and willingly paid those bribes in order to continue securing highly profitable contracts from Iraq.

17.   The Kickback Scheme could not have succeeded without the knowing and substantial participation of BNP. As operator and overseer of the Escrow Account, BNP had no authority to "pay, transfer, assign, hypothecate, negotiate, pledge or otherwise dispose of or deliver any funds or other assets...except in strict accordance with the express terms of" its agreement with the UN.

18.   However, as detailed below, BNP knowingly facilitated illegal payments despite its knowledge, or reckless disregard, that the contracts that it was issuing letters of credit upon

4

were wildly over-inflated, contained terms that did not comply with the Programme's requirements, and therefore reflected secret bribes to Iraq.

19.     The kickbacks that AWB paid totaled more than $200,000,000 (U.S.) dollars. BNP, for its part, facilitated kickbacks to the Hussein Regime totaling as much as $1,500,000,000 (U.S.) dollars.

20.     The Kickback Scheme had a devastating impact upon the Class. Steven Groves, counsel to the United States Senate's Permanent Subcommittee on Investigations, noted **"[k]ickbacks under [the Programme] had a direct impact on the people of Iraq - by definition, every dollar that was siphoned off by Saddam Hussein from the Iraq escrow account at BNP Paribas was a dollar that did not go to buy food, medicine, or other humanitarian goods for the Iraqi people."** (Emphasis added)

21.     Plaintiffs estimate, based upon information currently available to them, that the Kickback Scheme, for which AWB and BNP face joint and several liability, caused the Class damages of at least $200,000,000 (U.S.) dollars, exclusive of pre-judgment interest, and any treble and/or punitive damages that may be awarded.

22.     Although the illegal conspiracy among AWB, BNP, and the Hussein Regime was intricate and complex, and is set forth in detail in this Complaint, its central purpose was simple: the large-scale theft and diversion of money intended to benefit the Class and other Iraqi citizens to the Hussein Regime. Defendants and the Hussein Regime accomplished that objective not only by facilitating the Kickback Scheme, but also by providing substandard goods and services to the Class.

## PARTIES

### PLAINTIFFS

23.     Plaintiffs Hana Ahmed Karim, Ranjdar Mustafa Hasan, Rebar Jahur Ismail, Herish Said Ali, Karzan Sherko Tofia, Farhad M. Murasl, and Herish Hassan Yousif were, at all relevant times, citizens of the three Iraqi northern governorates.

24.     Although each of the plaintiffs was entitled to receive Programme benefits, he or she did not receive the full benefits to which he or she was entitled, and, as a result of defendants' participation in the Kickback Scheme, and defendants' violation of applicable U.S. law, including the following RICO predicate acts, (a) 18 U.S.C. § 1952 (Travel Act); (b) 18 U.S.C. § 1956 (money laundering); (c) 18 U.S.C. § 1957 (monetary transactions involving unlawfully derived property); (d) 15 U.S.C. §§ 78dd-1 *et seq.* (Foreign Corrupt Practices Act); and (e) 50 U.S.C. § 1701 *et seq.* (International Emergency Economic Powers Act), including violations of 31 C.F.R. Part 575 (Iraqi Sanctions Regulations), was injured in his or her property.

### DEFENDANTS

25.     Defendant AWB was established in 1939 as the Australian Wheat Board. Between its founding and 1999, AWB functioned as a statutory body of the government of Australia that controlled the domestic and export marketing of Australian wheat.

26.     In July 1999, Australia enacted legislation to transfer control of AWB to a private grower-owned corporate group of companies, and in August 2001, AWB was placed on the Australian Stock Exchange as a publicly-traded company.

27.     AWB has continuously sold wheat to Iraq since 1948. Under the Programme, AWB sold a total of 6.8 million tons of wheat to Iraq, receiving over $2.3 billion in payments from the Escrow Account.

28.     Defendant BNP, a major European bank with a presence in more than 85 countries, is headquartered in Paris, France, and maintains offices in the United States, including in this District.

29.     BNP maintained the Escrow Account for the Programme at its New York branch, and is - and at all relevant times was - licensed to do business in New York.

## VENUE AND JURISDICTION

30.     The jurisdiction of this Court is founded, *inter alia*, on 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction under 28 U.S.C. § 1331 since this action arises, *inter alia*, under 18 U.S.C. §§ 1962(c) and (d) and 1964(c), all of which are provisions of the federal RICO statute.

31.     Venue is proper in this District because, *inter alia*, many of the acts and much of the conduct charged herein occurred in this District. Moreover, BNP maintains offices in this District.

32.     Furthermore, according to an official statement submitted by AWB General Manager Timothy Oswald Snowball, AWB's U.S. affiliate's office (based in New York until October 2000) was responsible for liaising with Australia's mission to the UN (which also maintained offices in New York) to ensure that AWB was "paid efficiently and promptly for shipments to Iraq made under the [Programme]. As part of this role [Snowball] would provide any further information to the Australian Mission that [was] necessary to ensure prompt payment. This information was collected from AWB Limited in Melbourne."

7

33. In addition, the Programme's Escrow Account was maintained and operated in this District. BNP's New York branch had principal responsibility for operating the Escrow Account.

34. This Court has personal jurisdiction over defendants because defendants maintained offices, conducted or transacted substantial business, and committed tortious acts in New York. N.Y. Civ. L. & Prac. R. 301 and 302. As alleged herein, jurisdiction is also appropriate because defendants engaged in substantial conduct in connection with the schemes detailed herein in furtherance of their conspiracy in New York.

## CLASS ALLEGATIONS

35. Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(3) on behalf of a class (the "Class") consisting of all Iraqis who resided in the three northern governorates of Iraq during any part of the Programme.

36. The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements delineated in Fed. R. Civ. P. 23.

37. The members of the Class are so numerous that joinder of all members is impracticable. Although the precise number of Class members is unknown to plaintiffs at this time and can be determined only by appropriate discovery, it is reasonably estimated that the Class consists of tens of thousands of members.

38. Common questions of law and fact exist as to all members of the Class that predominate over any questions that may affect only individual members. The questions of law and fact common to the Class include, but are not limited to: (a) whether defendants are properly within the jurisdiction of this court; (b) whether defendants committed RICO

8

predicate acts or conspired to violate the RICO statute; (c) whether defendants acted with the requisite mental state; and (d) the appropriate measure of damages and other relief.

39.     Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs were citizens of the three northern governorates during the existence of the Programme and did not receive the full value of humanitarian goods to which they were entitled. The harm plaintiffs and all other Class members suffered was proximately caused by the same conduct of defendants.

40.     Plaintiffs will fairly and adequately represent and protect the interests of the Class because plaintiffs have no interests antagonistic to, or in conflict with, the other members of the Class. Plaintiffs have retained competent counsel, experienced in complex commercial, human rights, banking, and mass tort litigation, who intend to prosecute this action vigorously.

41.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is numerous and geographically dispersed. While the monetary damages suffered by individual Class members are substantial, the expense and burden of individual litigation make it impractical for individual Class members to seek redress for the wrongful conduct alleged herein.

42.     If Class treatment of these claims were not available, defendants would retain millions of dollars to which they are not entitled. In this class action, the Court can determine the rights of all Class members with judicial economy.

43.     The Class is readily definable, and treatment as a class action will reduce the possibility of repetitious litigation. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## THE PROGRAMME AS DESIGNED AND INTENDED

### Background Of The Programme

44.     In August 1990, in the wake of the first Persian Gulf War, the UN Security Council adopted Resolution 661. That resolution required UN member states to prevent the import and export of goods to and from Iraq, except for humanitarian supplies.

45.     In addition, under the authority granted to him pursuant to the International Emergency Economic Powers Act ("IEEPA"), on August 2, 1990 former President George H.W. Bush issued Executive Order 12722. That Order prohibited all transactions with Iraq, and authorized the U.S. Treasury Department to issue regulations in connection with the Order.

46.     On August 9, 1990 former President George H.W. Bush issued Executive Order 12724, which imposed additional restrictions on transactions with the Hussein Regime.

47.     Thereafter, the Treasury Department's Office of Foreign Assets Control ("OFAC") issued several regulations codified at 31 C.F.R. Part 575 prohibiting transactions with Iraq.

48.     31 C.F.R. §§ 575.201 and 575.210 prohibited the transfer of property interests in the United States to the Iraqi government absent specific authorization from the U.S. government.

49.     31 C.F.R. § 575.211 formally prohibited engaging in an evasion or conspiracy to evade the U.S.'s sanctions regime against Iraq.

50.     OFAC's regulations blocked all property and interests in property of the government of Iraq or any person purporting to be the government of Iraq, its agencies, instrumentalities, and controlled entities, including the Central Bank of Iraq ("CBI"), that were

in the U.S., that came within the U.S., or that would thereafter come within the possession or control of U.S. persons, including their overseas branches.

51.     OFAC's regulations remained in place from the commencement of the Programme until May 22, 2003, when the UN Security Council, pursuant to UN Security Council Resolution 1483, called for the repeal of Resolution 661's sanctions regime.

52.     Coinciding with the UN Security Council's resolution, and following the removal of the Hussein Regime in the spring of 2003, the United States' sanctions against Iraq began to be lifted. OFAC's regulations were finally, officially repealed by President George W. Bush on July 29, 2004 via Executive Order 13350.

53.     The United States was obligated to obey the terms of Resolution 661, because the United States is a signatory to the UN Charter. The UN Charter obligates signatories to comply with decisions of the UN Security Council such as Resolution 661.

54.     Resolution 661 prohibited any activities ". . . which would promote or are calculated to promote the export or trans-shipment of any commodities or products from Iraq."

55.     Resolution 661 also barred any financial transactions with any person or entity in the Hussein Regime other than payments exclusively for "medical purposes, and, in humanitarian circumstances, foodstuffs."

56.     In effect, Resolution 661 barred nearly all direct financial transactions with the Hussein-led Iraqi government.

57.     In an effort to alleviate the hardships ordinary Iraqis suffered under the sanctions, the UN Security Council passed Resolution 986 on April 14, 1995. Resolution 986 constituted a limited exception to the sanctions regime by establishing the Oil-For-Food-Programme.

11

58.     Resolution 986 was joined by a May 20, 1996 memorandum of understanding between the government of Iraq and the UN ("MOU"). Under the MOU, Iraq agreed to Resolution 986's implementation.

59. ·   In broad terms, the Programme permitted authorized purchasers to buy Iraqi oil. The proceeds of those sales were placed into the Escrow Account (for which BNP served as escrow agent). Escrow Account funds could then be used to buy humanitarian goods and supplies.

60.     Under the Programme, thirteen (13) percent of Escrow Account funds were specifically allocated for the three Iraqi northern governorates. Accordingly, the Programme established a quantifiable monetary benefit for plaintiffs and the Class.

61.     Resolution 986 and the MOU explicitly required that all oil proceeds be deposited into the Escrow Account and all payments for humanitarian goods supplies be paid out exclusively from the Escrow Account. At the same time, Resolution 986 and the MOU prohibited direct financial transactions with Iraq or indirect financial transactions outside the strict parameters of the Programme.

62.     The first shipment of humanitarian goods arrived in Iraq in March 1997. Between 1997 and 2003, Iraq expended approximately $34.5 billion of Escrow Account funds for food, medicine, equipment, and other civilian goods for Iraq: $32 billion on Iraq's fifteen central and southern governorates, and $2.5 billion on Iraq's three northern governorates. UN-related agencies spent another $2.2 billion on the northern governorates.

## Rules Governing Transactions With Iraq And Coordination of Iraq's Purchases

63.     Under the Programme, companies selling humanitarian goods to the central and southern governorates contracted with an Iraqi government ministry. Although companies

12

selling humanitarian goods to the northern governorates contracted with UN-related agencies instead of the Iraqi government for most goods, bulk goods (like wheat) were still negotiated with an Iraqi government ministry.

64.    At least sixteen (16) Iraqi ministries procured goods through the Programme, totaling $34.5 billion in purchases. Four ministries (Trade, Oil, Electricity, and Health) accounted for more than three-quarters of the purchases, with the Ministry of Trade alone accounting for more than half.

65.    To coordinate its participation in the Programme, Iraq established a variety of committees. The most significant committee was the Supreme Command Council, which oversaw Iraq's purchases of humanitarian goods.

66.    The Leading Committee, which was hierarchically directly beneath the Supreme Command Council, oversaw allocations of Programme funds to Iraqi ministries.

67.    Beneath the Leading Committee were a number of committees responsible for implementation of the Programme. These committees included the Import Committee, the Technical Committee, and the Economic Affairs Committee.

68.    The Import Committee supervised ministry expenditures, tracked the execution of contracts and accounted for Service Fees, described in detail *infra*.

69.    The Technical Committee prepared a distribution plan (the "Plan"). The Plan enumerated those humanitarian items Iraq estimated it needed for each particular Programme phase. The Technical Committee also reviewed the technical specifications for individual contracts.

70.    Finally, the Economic Affairs Committee helped formulate Iraq's methods and rates of collecting illegal kickbacks under the Programme.

71.    Beneath the aforementioned Committees were the State Owned Enterprises ("SOEs") - such as the Iraqi Grain Board ("IGB") - that purchased goods for their respective ministries, coordinated tenders, negotiated with suppliers, and signed contracts submitted to the UN.

72.    Vessels berthing at Umm Qasr, Iraq's major seaport, required approval from the Iraqi State Company for Water Transport ("ISCWT") before being permitted to discharge their goods.

73.    ISCWT was one of the State Owned Enterprises overseen by the Iraqi Ministry of Transportation and Communication ("Transportation Ministry"). ISCWT supervised, under Iraqi law in effect at that time, all Iraqi ports, although other SOEs handled the actual discharge and handling of cargoes.

74.    At the beginning of each Programme phase SOEs advertised tenders for contracts consistent with the specifications of the Plan prepared by the Technical Committee.

75.    Once bids were received, they were assessed and forwarded to Iraqi ministerial committees for further evaluation.

76.    Selected applicants - like AWB - were then invited to negotiate humanitarian goods contracts in Baghdad. Following approval by Iraqi authorities, the CBI requested that BNP issue a letter of credit ("LC") in favor of the supplier from the Escrow Account.

77.    Any goods shipped under the Programme had to be identified in advance on the Plan prepared by the Technical Committee. In every Programme phase, Iraq supplied the Plan, which had to be approved by the UN Secretary General. As alleged *supra*, each Plan enumerated those humanitarian items Iraq estimated it needed for that particular Programme phase.

14

78.     The contract for the goods was then forwarded through the company's home country mission to the UN's Office of the Iraq Programme ("UN-OIP"). UN-OIP's "Contracts Processing and Monitoring Division" reviewed the contract for pricing and value details.

79.     UN-OIP was responsible for the overall management and coordination of all UN humanitarian activities in Iraq under Resolutions 661 and 986 and the procedures established by the UN Security Council through a committee established under Resolution 661 to ensure that resolution's implementation (the "661 Committee"). UN-OIP was also responsible for confirming that humanitarian activities were in accord with the MOU between Iraq and the UN.

80.     If a contract's paperwork was in order, the contract was subject to review and approval by the 661 Committee. The 661 Committee utilized a "no objection" procedure, by which the contract was deemed approved unless objected to by any of its members.

81.     Once the goods contract was approved, the goods could be transported into Iraq. Upon arrival in Iraq, the goods had to be certified by UN-retained border inspectors. Lloyd's Register Inspection Ltd. ("Lloyd's") monitored humanitarian goods imports from 1997 to January 1999; Cotecna Inspection SA ("Cotecna") replaced Lloyd's and monitored humanitarian goods imports from February 1999 to 2003. Once goods had been certified by the inspectors, BNP paid the goods supplier from the Escrow Account in New York.

## Transport Of Goods And Handling Of Cargoes At Umm Qasr

82.     Goods procured by Iraq under the Programme could enter Iraq either at Umm Qasr port or one of three specified locations along Iraq's border: (1) Trebil, Jordan, (2) Al Waleed, Syria, or (3) Zakho, Turkey.

15

83.     Goods imported via Umm Qasr, such as the wheat shipped by AWB, were transported by vessel, and subsequently trucked inland, whereas goods imported via the other three entry points were transported over land to the entry point and then, almost exclusively, by the same trucks, to Baghdad or Iraqi warehouses elsewhere.

84.     Goods imported via Umm Qasr accounted for nearly half of the total value of procured goods under the Programme.

## OVERVIEW OF THE HUMANITARIAN GOODS KICKBACK SCHEME

85.     The Hussein Regime selected companies to receive contracts to supply humanitarian goods based on their willingness to pay it illegal kickbacks. News reports to date indicate that the Hussein Regime derived at least $1.5 billion from illegal kickbacks.

86.     The term "kickback" as used herein denotes illicit payments to the Hussein Regime by contractors, including AWB, made in connection with Iraq's selection of companies to receive contracts to supply goods under the Programme.

87.     The Kickback Scheme (and Class Period) began on June 10, 1999, during Programme Phase VI, when Iraq mandated that humanitarian goods suppliers pay inland transport fees ("Transport Fees") to allow Iraq to recoup costs it claimed to have incurred from the transport of goods to inland destinations in Iraq.

88.     As detailed below, while the payment of Transport Fees was not per se impermissible under the Programme's rules, the manner in which AWB (and other good suppliers) paid them to Iraq undeniably violated the Programme's restrictions, and constituted violations of: (a) 18 U.S.C. § 1952 (Travel Act); (b) 18 U.S.C. § 1956 (money laundering); (c) 18 U.S.C. § 1957 (monetary transactions involving unlawfully derived property); (d) 15 U.S.C. §§ 78dd-1 *et seq.* (Foreign Corrupt Practices Act); and (e) 50 U.S.C. § 1701 *et seq.*

(International Emergency Economic Powers Act), including violations of 31 C.F.R. Part 575 (Iraqi Sanctions Regulations).

89.     As detailed herein, AWB intentionally, or recklessly, paid bribes to the Hussein Regime, often through companies that AWB knew, or recklessly disregarded, were fronts for the Hussein Regime, with the sole purpose of securing further contracts at the expense of the Class.

90.     The Programme was specifically intended to prevent the Hussein Regime from stealing Programme money from the Programme's intended beneficiaries, including disguising Programme funds as vague "fees" that did not benefit Iraqis, including Class members. In theory, transparency and accountability were supposed to be hallmarks of the Programme's design.

91.     In mid-2000, the Kickback Scheme entered a broader phase when Iraq imposed an across-the-board ten percent (10%) kickback on all humanitarian goods contractors. This kickback, paid by contractors transporting goods over land as well as contractors (like AWB) shipping goods to Iraqi ports, was added to, and often interpolated in, the Transport Fees.

92.     This ten percent (10%) kickback, dubbed an "after-sales-service-fee" ("Service Fees"), was paid before goods entered Iraq.

93.     The Transport Fees and Service Fees that AWB paid Iraq were financed by Escrow Account funds controlled by BNP. Thus, funds were siphoned out of the Escrow Account in New York and turned over to the Hussein Regime.

94.     On certain occasions, AWB was forced to advance the costs of the bribes it paid to the Hussein Regime and then used payments it received from the Escrow Account to "self-insure," or recoup, the costs of the bribes already advanced.

95.     Ultimately, AWB did not have to expend any of its own money in order to participate in the illegal Kickback Scheme with Iraq. Instead, AWB effectively passed on the costs to the Class members.

96.     In either case, whether diverted to the Hussein Regime, or used to indemnify AWB post-bribe, Escrow Account funds were knowingly, or with reckless disregard, wrongfully diverted from their intended beneficiaries.

## THE "TRANSPORT FEES" KICKBACK SCHEME  GENERALLY

### General Issues Concerning Payment For Inland Transport

97.     Because of the restrictions on direct financial transactions with Iraq, in the early days of the Programme questions arose at the UN concerning whether companies were permitted to pay Iraq or Iraqi entities for port charges (i.e., fees for the use of Iraqi ports or navigational services).

98.     These questions from the 661 Committee ultimately generated an advisory opinion, issued in November 1997, from the UN's Office of Legal Affairs ("OLA").

99.     OLA's 1997 opinion clarifies that no conceivable reading of operative UN guidelines would have permitted AWB, other goods suppliers, or BNP as agent for the Escrow Account, to engage in the Kickback Scheme.

100.     OLA's 1997 opinion advised the 661 Committee that payment of port charges to Iraq was permissible in connection with lawful shipping activity, provided the fees and charges did not exceed "what is customary in such circumstances" and the arrangements otherwise "exclude economic or financial benefits in favor of Iraqi agencies or companies."

101.     In June 1998, OLA extended its opinion to encompass the payment of inland transport fees to Iraq (i.e., fees for transporting goods from their points of entry into Iraq to

their ultimate destination within Iraq). OLA concluded that payments of such fees would not violate UN sanctions provided that they complied with two restrictions.

102.   First, the payments could not "exceed what is customary and reasonable in the circumstances" and therefore represent a source of income to Iraq. Instead, they were to be: limited to charges for transportation (i.e., road tolls); levied on a non-discriminatory basis; and commensurate with whatever administrative expenses might reasonably be incurred in connection with the transit.

103.   Second, the payments could be made in **Iraqi dinars only**.

104.   Because Iraqi dinars were a nonconvertible currency (i.e., not openly traded), OLA's requirement that inland transport fees be paid in dinars essentially prohibited the practice (of paying inland transport fees) because the only way to obtain substantial dinars was through financial transactions with "persons or bodies within Iraq" in express violation of Resolution 661.

105.   In a June 2000 memorandum, OLA reiterated its view that exporters could pay port fees to Iraq so long as the charges did not exceed customary and reasonable rates, and were paid in dinars.

106.   Importantly, however, OLA's June 2000 memorandum also advised that it was not permissible for goods suppliers - such as AWB - to pay port charges to a specific Jordanian company that was allegedly furnishing port services pursuant to an agreement with Iraq.

107.   The Jordanian company referenced in OLA's memo - Alia for Transportation and General Trade ("Alia") - was actually a front company for the Hussein Regime. Alia was 49% owned by Iraq, and was used to collect and transmit kickback payments. Alia's role in connection with the Kickback Scheme is discussed in greater detail *infra*.

108. OLA, though likely unaware that Alia was purely a conduit for kickbacks, nevertheless stated that **any** payment to Alia absent approval from the 661 Committee would violate the Iraq sanctions program embodied in Resolution 661. That resolution barred services "calculated to promote the import from or export to Iraq of products and commodities."

109. OLA's legal opinion emphasized that OLA was unaware of Iraq or Alia having applied for approval for Alia to provide shipping services pursuant to the Programme.

110. In fact, at no time did the 661 Committee ever approve such an arrangement.

111. In a June 27, 2000 letter sent from Benon Sevan, UN-OIP's Executive Director, to Iraqi officials, the UN expressly communicated its prohibition on payments to Alia.

112. Sevan informed Iraq that payment of port fees had to be customary and reasonable in amount and made only in Iraqi dinars. Sevan's letter also explained that payments to Alia required 661 Committee approval if, as appeared to be the case, Iraq had engaged Alia to provide Programme-related services.

113. OLA also concluded that the sanctions regime did not necessarily bar the inclusion of services in Programme contracts. OLA qualified its conclusion, however, by further stating that: (1) services had to comply with certain limitations; and (2) payment for "services" required the explicit approval of the 661 Committee or UN-OIP.

114. Although both Resolution 986 and the MOU between Iraq and the UN explicitly permitted Iraq to import only "goods," OLA reasoned that the Programme's framework did permit the provision of services "ancillary" to the supply of those goods.

115. OLA advised UN-OIP that "services" qualified as sufficiently "ancillary" to the provision of goods if the services could be "considered to form part of the supply of an

operational and operable product and so be instrumental to the provision, or even to be a constituent element, of the goods being supplied."

116.    In OLA's view, services such as "assembly, installation and commissioning," were ancillary, and thus potentially deserving of payment. However, OLA also concluded that services for which the goods supplied were merely incidental did not qualify for payment.

117.    OLA also advised that no supplier should be paid for even proper, qualifying "ancillary" services, until independent inspection agents for the Programme provided authenticated confirmation that the relevant "ancillary" services had, in fact, been rendered. OLA urged UN-OIP to include this requirement in Iraq's contracts with goods suppliers.

118.    Critically, OLA never concluded that suppliers could make direct payments to the Hussein Regime instead of actually providing those services that were contained in approved Programme contracts.

119.    OLA's legal opinions make it clear that neither the 661 Committee, UN-OIP, nor the UN ever created a legal safe harbor for unauthorized payments to Iraq or entities controlled by Iraq. Thus, payments made to Iraq outside express U.N guidelines violated UN sanctions against Iraq and criminal violations of applicable regulations of the U.S Treasury Department enforceable under IEEPA, and constituted money laundering and bribery of foreign officials (in contravention of the FCPA).

120.    In fact, the payments were clandestine transactions intended to unlawfully transfer funds to the Hussein Regime, and did not comport with even the most expansive and permissive interpretation of operative UN guidelines.

121.    First, and most importantly, the relevant resolutions and procedures governing the Programme never envisioned direct payments to Iraq or any Iraqi-controlled entities (such

as Alia) regardless of whether the payments were termed "Transport Fees" or "Service Fees." Neither the UN Security Council nor its 661 Committee ever approved such payments.

122.    _Second_, even accepting OLA's legal opinion that it was permissible to pay certain fees to Iraq, OLA required that such payments be reasonable and made only **in Iraqi dinars**.

123.    However, as alleged _infra_, the Transport Fees paid by AWB were not reasonable in amount, particularly as the Programme progressed, when it was clear that they did not even remotely correspond to real transportation costs.

124.    In addition, the fees were paid in U.S. dollars, euros and other foreign currency, and not in dinars. Indeed, it would have been impossible for AWB to pay Iraq in dinars without violating the sanctions regime because dinars were a non-convertible currency.

125.    _Third_, former senior officers of AWB have admitted that the payments made by AWB were illegal and were in violation of Resolution 986.

126.    _Finally_, with regard to payments made to Alia by AWB and others, the Iraqi government _never_ sought the 661 Committee's approval, despite Iraq's receipt of Benon Sevan's June 27, 2000 letter that specifically barred payments to Alia.

127.    Accordingly, AWB's knowing, or reckless, payment of Transport Fees and Service Fees, and BNP's knowing, or reckless, approval and transfer of such fees were impermissible under any reading of the rules governing the Programme.

128.    Instead, in contravention of the Travel Act, the FCPA, and 18 U.S.C. §§ 1956 and 1957, the payments were disguised bribes to foreign officials of a government that the U.S. had prohibited all transactions with, outside the parameters of Resolution 986, the MOU, and other rules governing the Programme.

## Phases I-V:
## Suppliers Using Umm Qasr Port Not Responsible For Inland Transport Costs

129.    In a typical contract for humanitarian goods, the unit price negotiated between a supplier and Iraq encompassed the cost of the procured commodity, and also specified transportation expenses and related insurance fees.

130.    The combination of cost, insurance, and freight was denoted by the commonly-used acronym **"CIF,"** a term of art in the international shipping and commercial good businesses.

131.    Thus, a contract for the supply of 60,000 metric tons of wheat to Iraq at a rate of **"CIF $310.00 per metric ton"** reflected the value of the wheat, as well as the cost of transporting the wheat to a destination mutually agreeable to Iraq and the supplier (i.e. AWB).

132.    Neither Resolution 986, subsequent Security Council resolutions, nor the MOU specified how goods were to be transported beyond the designated entry points of Iraq.

133.    Contracts for goods in Phases I-V of the Programme that specified the land entry points of Trebil, Al Waleed, or Zakho as the designated entry point typically provided for **"CIF all Iraqi Governates"** or **"CIF Baghdad,"** obligating suppliers to transport cargoes inside Iraqi borders.

134.    By contrast, contracts specifying the port of Umm Qasr as the delivery point (i.e. contracts involving AWB) provided for **"CIF Free out Umm Qasr," "CIF Free on board,"** or **"CIF Free on truck,"** all of which indicated that the supplier was _not_ responsible for transporting cargoes inside Iraqi borders. Instead, Iraq bore responsibility for the inland transportation costs.

### Phases VI-Conclusion Of Programme:
### Suppliers Using Umm Qasr Port Responsible For Inland Transport Costs

135.   On June 10, 1999, shortly after the commencement of Phase VI of the Programme, Iraq's Economic Affairs Committee issued a directive requiring that fees for inland transportation inside of Iraq – i.e. Transport Fees - now had to be paid by suppliers for cargoes delivered to Umm Qasr. However, and as alleged *supra*, payment of any such fees absent explicit UN approval was prohibited.

136.   As the Programme progressed, contracts between Iraq and humanitarian goods suppliers reflected this modification by specifying the final destination of "**CIF all Iraqi Governates**" or "**CIF Baghdad.**"   As noted *supra*, those terms obliged suppliers to pay Transport Fees to the Iraqi government following discharge of the goods at Umm Qasr.

137.   Although the Hussein Regime attempted to characterize the Transport Fees as merely a means of covering the cost of transporting goods from Iraqi ports and borders to warehouses inside Iraq, these Transport Fees were, in fact, secret bribes to the Hussein Regime.

138.   AWB's knowing, intentional, or reckless, payment of these bribes reveals its participation in an enterprise - the Kickback Scheme - that generated revenues for Iraq through a pattern of knowing, intentional, or reckless, money laundering, bribery, breach of U.S Treasury Department regulations governing trade with Iraq, and violation of the U.S.'s obligations under the UN Charter. The payments also demonstrated AWB's conspiracy with BNP and agents of the Hussein Regime to engage in such conduct.

139.   The Transport Fees were set based on the kind of goods being transported, the packaging, the point-of-entry into Iraq, and the phase in which a given contract was signed.

140.    Transport Fees were payable to designated Iraqi entities and regime-controlled front companies. Although Iraq's Transportation Ministry oversaw the funds collection, a fee schedule was circulated to all Iraqi ministries at the commencement of each Programme phase.

141.    The Iraqi State Company for Water Transport – the official Iraqi SOE for water transport – coordinated collection of Transport Fees. ISCWT established a number of different mechanisms to facilitate payment, but the vast majority of Transport Fees payments were made through front companies falsely posing as providers of legitimate trucking services.

142.    Significantly, as noted *supra*, the Hussein Regime did not request that suppliers such as AWB pay the fees at their own expense. Instead, and to the detriment of the Class, Iraq improperly and misleadingly incorporated the cost of paying these Transport Fees into the contracts it signed with suppliers.

143.    The Transport Fees were, in turn, funded from the Escrow Account, **notwithstanding the fact that no such fees could be inserted into the contract price absent explicit UN approval**.

144.    Following the imposition of Transport Fees, contract negotiations typically followed a prescribed sequence.

145.    First, a purchasing body of the Iraqi government negotiated a unit price, inclusive of insurance and transportation to Iraq with a supplier.

146.    Once a mutually acceptable price was reached, the Iraqi purchasing body informed the supplier of the precise cost of the Transport Fees that it was required to pay.

147.    If the supplier agreed to Iraq's terms, the previously-negotiated unit price was increased in accordance with the Transport Fees rate established by the Iraqi Transportation

Ministry. In this manner, suppliers, including AWB, were able to absorb the cost of the bribe, to the detriment of Class members, including plaintiffs.

148.    The revised, artificially inflated price for the goods was included in the final version of the contract signed between Iraq and the supplier and submitted to the UN for payment from the Escrow Account.

149.    Following UN contract approval, an Iraqi entity responsible for the collection of payments would contact the supplier and inform it of the exact amount owed to the Hussein Regime as Transport Fees and the designated payment method.

150.    Once the designated Iraqi entity confirmed that the supplier had paid the prescribed Transport Fees, the supplier's goods were finally permitted to enter Iraq.

151.    Through the above-described method, the Hussein Regime, with the collusion of suppliers like AWB, and the escrow agent, BNP, illegally obtained funds that it could use for its own purposes.

152.    The Transport Fees - bribes paid to Iraq - violated the Travel Act and FCPA's restrictions on unapproved payments to foreign governments, particularly because trade with Iraq was illegal under IEEPA.

153.    Suppliers such as AWB acquiesced to the Transport Fees aspect of the Kickback Scheme because the bribe payments did not reduce the profits they generated through their participation in the Programme.

154.    The only disadvantage the suppliers incurred was the timing of contract execution: funds were not released from the Escrow Account until after an inspection agent had authenticated the arrival of goods at the Iraqi border. Accordingly, suppliers were often

forced to remit the Transport Fees to Iraq before BNP refunded their outlays out of the Escrow Account.

155.    However, as alleged further *infra*, the Hussein Regime provided alternative mechanisms for suppliers to obtain prompt repayment for the kickbacks that they advanced.

156.    As a result, the conspiracy between Iraq, AWB and other goods suppliers, facilitated by BNP, to maintain the Kickback Scheme and reap profits from the Programme, continued successfully.

157.    Neither the UN Secretariat (led by the Secretary General) nor the 661 Committee ever sanctioned the arrangements whereby AWB and its co-conspirators financed the Hussein Regime through the payment of the lucrative Transport Fees.

158.    Defendants' intentional, knowing, or reckless breach of Resolution 986 thus not only ran afoul of Programme regulations, but also violated U.S. laws that are predicate acts under 18 U.S.C. § 1961(1).

## Payment Mechanisms For Transport Fees

159.    Transport Fees were paid in one of four ways: (1) in cash to an ISCWT representative at Umm Qasr or in Baghdad; (2) in cash to the al-Rashid Bank or al-Rafidain Bank in Baghdad; (3) by bank transfer to ISCWT's account at the Amman, Jordan branch of al-Rafidain Bank; or (4) by bank transfer to accounts held by front companies in Jordan or the United Arab Emirates.

160.    Payments via front companies became the preferred method for suppliers because large volumes of cash were difficult and dangerous to transport and suppliers were hesitant to make transfers directly to Iraqi authorities. However, in certain instances, private agents (rather than Iraqi front companies) facilitated payments to ISCWT's account.

161.    When the Hussein Regime introduced the illegal Transport Fees scheme, Alia and Amman Shipping, both based in Amman, Jordan, were two of the most frequently used front companies. Although Alia and Amman Shipping posed as legitimate transportation services providers from Umm Qasr, they functioned purely as conduits for payment of Transport Fees to the Hussein Regime. In exchange, they received a small commission on the fees channeled to the regime.

162.    A December 21, 2000 memo from Iraq's then-Minister of Trade, Mohammad Mehdi Saleh, to ISCWT (with copies sent to al-Rafidain Bank and the Iraqi Ministry of Finance) reflected that this arrangement was little more than a scheme to disguise payments to Iraq by falsely representing that companies provided inland transportation for Programme goods:

> The State Company for Water Transport, through its representative in Amman, regularly follows up on transfers of money received from MOU suppliers through Umm Qasr by Jordanian front companies within two business bank days after deducting the commission percentage of 0.25% to the account of the State Company for Water Transport at Rafidain [Bank] Amman no. (8229) to guarantee that the money is under the control of the Iraqi government, bearing in mind to immediately pay off amounts received from suppliers into the company's account at Amman bank (whenever this is possible).

163.    All funds paid by front companies or suppliers into ISCWT's account at the Amman branch of al-Rafidain bank were promptly transferred into ISCWT's account at the Baghdad branch of al-Rafidain bank. When it received the funds, the Baghdad branch notified ISCWT. Furthermore, the front companies themselves routinely advised ISCWT that a supplier had fulfilled its obligations.

164.    ISCWT generally refused to permit discharge of a supplier's cargoes if ISCWT did not first receive confirmation that the supplier had paid the Transport Fees into the Iraqi-

controlled bank account. In such circumstances, the supplier or its vessel chartering company incurred demurrage of thousands of dollars per day.

165.    One supplier reported that failure to pay the illegal Transport Fees on only one contract had resulted in massive demurrage and prevented the vessel's entire contents from being offloaded.

166.    Accordingly, AWB knew, or recklessly disregarded the fact, that if it did not continue paying undisclosed and unauthorized secret bribes to Iraq through the Kickback Scheme - notwithstanding the fact that money laundering laws and regulations, anti-bribery statutes, U.S. Treasury Department regulations, and the Programme rules and resolutions themselves barred such payments - the Hussein Regime would refuse discharge of the cargoes, and AWB would face massive demurrage charges and other losses resulting from its failure to participate in the Kickback Scheme.

## THE "SERVICE FEES" KICKBACK SCHEME

### Introduction Of Service Fees

167.    Approximately one year after Iraq began requiring payment of Transport Fees to ministerial entities and front companies like Alia, the Hussein Regime expanded its Kickback Scheme to include illegal Service Fees.

168.    This new, secret bribe, which in most instances was eventually equal to ten percent (10%) of the original contract value, applied to all goods purchased by each Iraqi ministry, irrespective of the point of entry into Iraq or means of transportation.

169.    Payment of this illegal fee was mandatory through the final phase of the Programme and earned the Hussein Regime more than $1 billion by March 2003.

170.    The Service Fees dimension of the Kickback Scheme commenced on or about August 3, 2000, two months after Phase VIII of the Programme had begun. On that day, Iraqi Vice President Taha Yassin Ramadan circulated a memorandum to all Iraqi ministries stating that the Iraqi Command Council had discussed the issue of "making additional revenues for commercial contracts" and had determined that all Programme suppliers would be required to pay Service Fees.

171.    Unlike Transport Fees, which were levied based on the weight or size of the procured commodity, Service Fees constituted a fixed percentage of the monetary value of the goods.

172.    Mr. Ramadan's August 3, 2000 memorandum suggested a two percent (2%) to five percent (5%) kickback for food and medicine and a five percent (5%) to ten percent (10%) kickback for all other goods. Ramadan's memorandum further noted that the Service Fees kickback percentage could be lowered or raised at the discretion of the Iraqi minister overseeing the contract in question.

173.    In October 2000, the Iraqi Command Council raised the minimum Service Fees percentage to ten percent (10%), and informed Iraqi agencies and ministries that any Service Fees raised above that threshold would be viewed as "commendable." Although ten percent (10%) was the average amount levied, in some instances Service Fees were as high as thirty percent (30%).

174.    As had been the case with the illegal Transport Fees, Iraq and its co-conspirators, including AWB, disguised the Service Fees by incorporating them into the contract value that was paid to suppliers out of the Escrow Account in New York.

175.    Contractual arrangements undertaken after AWB and other suppliers began to pay Service Fees operated in a similar manner to the contractual arrangements made after AWB and other suppliers began to pay Transport Fees kickbacks.

176.    Thus, a supplier was informed or reminded of its obligation to pay the secret Service Fees after a tender process had resulted in that supplier's selection by an Iraqi purchasing body.

177.    If a supplier agreed to these terms, its contract value was artificially inflated by the percentage demanded by the contracting Iraqi ministry. This upward revision was often accomplished by increasing the unit price; however, in some instances the Service Fees were actually explicitly inserted into the contract. On other occasions, Service Fees were disguised as performance bonds or maintenance or training expenses.

178.    Initially, suppliers could pay Service Fees in one lump sum or in installments that corresponded to individual shipments or deliveries of goods.

179.    However, subsequently, many Iraqi purchasing bodies demanded that suppliers sign secret auxiliary side agreements guaranteeing payment of the illegal Service Fees.

180.    An October 2000 memorandum circulated by the Iraqi Ministry of Trade stipulated that these agreements had to be drafted in such a manner that "the supplier commits to paying off the amount of the [Service Fees] as one lump sum, or installments . . . such that the payment is made before the goods are received."

181.    The covert side agreements varied in format, content, and level of detail. Some specified payment mechanisms and bank details, while others included only a pledge from the supplier to execute a funds transfer to pay the bribes.

182. Shipping agents reported to UN investigators that the Service Fees were mandatory on <u>all</u> goods entering Iraq after Phase VIII and that they were unaware of any goods being allowed into Iraq on a Phase VIII or later contract if the Service Fees had not been paid. Sales agents also informed UN investigators that they had been aware of the requirement to pay Service Fees from Phase VIII onwards.

183. In fact, in order to avoid incurring further costs if goods were refused at Iraq's border, suppliers routinely paid <u>all</u> of the illicit kickback fees <u>prior</u> to shipping goods to Iraq.

## EXPANSION OF TRANSPORT FEES KICKBACK SCHEME

184. In the same August 3, 2000 memorandum announcing the imposition of Service Fees, Iraqi Vice President Ramadan also advised Iraq's Transportation Ministry of new instructions concerning Transport Fees.

185. On August 6, 2000, three days after Ramadan's memorandum, Iraq's Economic Affairs Committee circulated a new schedule of Transport Fees, raising fees on all good imported through the Umm Qasr port for the remainder of Phase VIII.

186. Rates remained at or slightly above those levels until the Programme's conclusion. Most of the additional payments required by the Economic Affairs Committee were collected by ISCWT and transferred to the Ministry of Finance's coffers.

187. On November 6, 2000, Iraq's Deputy Prime Minister, Hikmat Al-Azzawi, distributed a memorandum advising all Iraqi ministries how to pay Service Fees. Al-Azzawi's memorandum specified that ISCWT was responsible for collecting Service Fees, which ISCWT then distributed to the Ministry of Finance and other Iraqi ministries and SOEs.

188. With regard to Transport Fees, which ISCWT was also responsible for collecting and disbursing, ISCWT made the following approximate distribution for bulk goods,

such as the wheat AWB delivered: $9 per-metric-ton ("p-m-t") to Land Transport, $10 p-m-t (or more) to the Ministry of Finance as a cash reserve, and $0.25 p-m-t for other entities providing port services.

189.  Transport Fees and Service Fees were often combined into one very high fee. As a result of this combination, and the increase in Transport Fees rates generally, bribe payments to ISCWT (often through the false fronts of Alia and Amman Shipping) increased dramatically between 2000 and 2002.

## Example of Kickback Scheme: AWB's Bei Hai Wheat Shipment

190.  A June 1, 2002 contract between the IGB and AWB, in which Alia forwarded bribe payments to Iraq, illustrates the Kickback Scheme's operation as a racketeering enterprise.

191.  The June 1, 2002 contract provided for a delivery of approximately 41,759 metric tons of bulk wheat, which AWB shipped on the vessel *Bei Hai*.

192.  Under the contract, AWB paid Alia approximately $2.3 million (U.S.) dollars in Transport Fees - a rate of roughly $54 p-m-t of wheat.

193.  Of those kick-backed funds, ISCWT distributed $980,000 that it had designated as Service Fees, to the Ministry of Finance. That sum equates to a markup of approximately ten percent (10%) of the value of the wheat discharged from the *Bei Hai*.

194.  The remaining kickbacks were disseminated as follows:  (1) $530,000 (or $12.61 p-m-t) for the Ministry of Finance; (2) $410,000 (or $9.75 p-m-t) for Land Transport; (3) $90,000 (or $2.17 p-m-t) for ports; and (4) between $10,000 and $70,000 (or approximately $0.13 - $1.71 p-m-t) for other "service providers," such as ISCWT or Iraq's National Insurance Company.

33

195.    According to an analysis provided by al-Rafidain Bank to ISCWT in 2005, between February and June 2003, ISCWT transferred approximately $666 million out of its account at al-Rafidain Bank to CBI accounts for twenty-eight (28) other Iraqi entities.

196.    More than half of those funds (or $373 million) was remitted to the Ministry of Finance. Of this $373 million, $283 million was raised through Service Fees and $90 million through Transport Fees. The majority of the remaining $293 million was transferred to Land Transport, the State Company for Ports, ISCWT, and the Ministry of Trade.

197.    Several shipping companies interviewed by UN investigators examining Programme abuses stated that goods suppliers - like AWB - must have known that Transport Fees were being paid to Iraq.

198.    First, the shippers confirmed to UN investigators that goods suppliers had assumed contractual responsibility for inland transportation.

199.    Second, invoices from shippers to suppliers often reflected these transportation costs.

200.    Third, it was necessary for goods suppliers needing specialized unloading and transportation equipment to inquire about specific shipping arrangements.

201.    Fourth, the only transportation that occurred within Iraq was controlled and supplied by the Hussein Regime.

202.    Finally, the shippers told the UN investigators that they were unaware of any goods entering Iraq through Umm Qasr after Phase VIII of the Programme for which Transport Fees had not been paid.

## Payment Mechanisms For Kickbacks And Use of Bank Guarantees

203.    Some suppliers shipping cargoes to Umm Qasr preferred to pay the illegal Service Fees separately from the illegal Transport Fees. In such cases, the suppliers and contracting ministries arranged for payment of fees on an individual basis.

204.    Iraq's Ministry of Finance was initially responsible for establishing payment mechanisms and monitoring actual collection of the secret bribes. In May 2001, these responsibilities were transferred to the CBI.

205.    Because some suppliers complained about being forced to pay the illicit Transport Fees and Service Fees before receiving Escrow Account funds from BNP, Iraq permitted some suppliers to instead obtain independent bank guarantees to pay the Transport Fees and Service Fees.

206.    Goods suppliers who obtained such bank guarantees did not incur out-of-pocket costs for paying the bribes, and therefore only had to pay the bribes after BNP had already paid the suppliers out of the Escrow Account in New York.

207.    Under the Kickback Scheme, Service Fees could be paid via: (1) cash payments (in Baghdad or at embassies in foreign capitals); (2) bank transfers; and (3) Iraqi front companies.

*Cash Payments*

208.    Service Fees received in cash were deposited into al-Rafidain Bank accounts and transferred to the CBI. In some instances, cash payments were transferred to Iraqi embassies in Jordan and the United Arab Emirates and then transferred to al-Rafidain Bank branches in Amman and Baghdad. Some cash payments were undertaken by Iraqi agents working on behalf of suppliers rather than by the suppliers themselves.

*Bank Transfers*

209.  At the outset of the Service Fees scheme, al-Rafidain Bank and the Ministry of Finance were tasked with establishing bank accounts in Amman and Beirut to facilitate the collection of kickbacks by Iraqi ministries and state companies.

210.  After the CBI had assumed the responsibility of managing and monitoring kickback accounts from the Ministry of Finance, the CBI established dozens of clearing accounts (also known as "bridge accounts") for all Iraqi ministries authorized to contract under the Programme.

211.  The bridge accounts, which were intended to receive, but not retain, kickback payments, were disguised in a variety of ways.

212.  In Amman, the accounts were registered under the names of Iraqi officials (sometimes with first and last names transposed).

213.  In Beirut, the accounts were unnamed "numbered" accounts.

214.  Every twenty-four (24) hours, under terms of signed agreements between the banks and the CBI, the bridge accounts' balances were transferred to other, secret, CBI-controlled accounts at the same institution.

215.  This was done to create the illusion of separation between the accounts storing Iraq's illicitly-gained kickback revenues and the accounts into which suppliers and front companies deposited Transport Fees and Service Fees. In other words, the bank accounts were a classic example of laundering the proceeds of illegally-obtained bribes.

216.  The deceptive structure of the accounts also helped protect Iraq against freezing of its assets.

217.    In addition, the bank account structure allayed the concerns of AWB and other suppliers hesitant to pay Iraqi entities directly (and thus clearly violate Programme rules and anti-bribery laws).

218.    AWB and its co-conspirators could point to the complex bank account structure and posit their (false) "plausible deniability" that the unapproved Service Fees and Transport Fees were not deliberate bribes to a government the U.S. and UN had unequivocally prohibited trade with.

219.    On a daily basis, banks holding bridge accounts transmitted documents to the CBI indicating the amounts paid by suppliers and the corresponding contract numbers. Upon receipt of this information, the CBI advised the relevant Iraqi ministry which suppliers had fulfilled their kickback obligations.

220.    Once notified, the Iraqi ministries directed BNP in New York to issue LCs from the Escrow Account in favor of the supplier. Once the LCs were issued, the ministries permitted goods to enter Iraq and discharge at warehouses.

221.    In addition to individual notifications, the CBI prepared monthly fee reports that it circulated to all ministries and senior Hussein Regime officials.

*Front Companies*

222.    Suppliers that did not want to pay into bridge or other CBI-controlled accounts could deposit Service Fees into accounts held by front companies based in Egypt, Lebanon, and the United Arab Emirates. These funds were subsequently transferred to bridge accounts in Lebanon and Jordan, and then to CBI accounts at al-Rafidain Bank in Amman.

223.    Some of these front companies, such as Alia, were partially owned by the Iraqi government; others were fully independent of Iraq.

224.    In exchange for their services, the front companies received a small commission on the illicit payments they collected from suppliers.

225.    One of these front companies was Al Wasel & Babel ("Al Wasel"), a Dubai-based firm established expressly to collect Service Fees. In April 2004, the U.S. Treasury Department designated Al Wasel as a front company of the Hussein Regime.

226.    In fact, Al Wasel had tried to purchase a surface-to-air missile system for Iraq, and, in order to avoid the sanctions regime, had done so under the guise of selling Iraq humanitarian goods.

227.    In addition to collecting the illegal Service Fees, some front companies (including Al Wasel) participated in the Programme directly. In an August 17, 2005 interview, former Iraqi Vice President Ramadan stated that he had signed an order giving preference to these companies because Iraq increased its revenue by dealing with its "own" companies.

228.    Although Iraqi front companies were, ironically, not exempt from paying the mandatory bribes themselves, they were often permitted to pay Service Fees after funds from the Escrow Account had been released by BNP, thus directly funding the Hussein Regime.

229.    In addition, Iraqi front companies were expected to offer competitive prices, and Iraq would secretly advise them if their prices were too high. so that they could adjust their bids to obtain the contracts.

*Bank Guarantees*

230.    Some Programme suppliers complained to the Iraqi government about its demand that Service Fees be paid prior to funds being released from the Escrow Account in New York.

231.   Suppliers raised specific concerns that they were paying kickbacks in connection with contracts that the UN-OIP or 661 Committee had not yet approved.

232.   In order to address these complaints, and avoid any interruption in the flow of illicit revenues, Iraq proposed that suppliers not amenable to paying fees in advance of recouping them from the Escrow Account be obligated, prior to LCs being issued, to obtain bank guarantees in favor of Hussein Regime-controlled accounts.

233.   The bank guarantees corresponded to the amounts levied by the Iraqi ministries as Transport Fees or Service Fees and were released once the CBI had confirmed that a supplier had paid the requisite fees.

234.   Some suppliers sought to layer their bank guarantees by issuing "backstop" guarantees. In other words, suppliers would arrange for an LC to be issued to a Lebanese or Jordanian bank. The foreign bank would, in turn, issue a guarantee in the same amount as the supplier's LC, in favor of Iraqi accounts.

235.   This arrangement was a textbook case of money laundering, intended to disguise the fact that a supplier was bribing the Hussein Regime and avoiding reporting it to the UN or any other regulator.

236.   Frequently, the bank guarantee requirement was included in side letters signed by suppliers in advance of contract execution. Iraqi purchasing bodies could exercise discretion when selecting which suppliers needed to provide bank guarantees that would remain in effect until payment, and which suppliers could be trusted to make payments after contracts were approved or funds were disbursed from the Escrow Account in New York.

237.   Most suppliers were agreeable to obtaining bank guarantees if they were requested to do so.

## IRAQ'S PURCHASE OF SUBSTANDARD GOODS AND OVERPRICING OF CONTRACTS

238.    By March 2003, Service Fees had generated over $1 billion of revenue for the Hussein Regime. Transport Fees had provided additional revenue of nearly $527 million. Thus, in total, the Hussein Regime utilized the Kickback Scheme to siphon more than $1.5 billion out of the Escrow Account in New York.

239.    At the same time, Iraq often procured substandard goods under the Programme, including lesser-quality imported wheat.

240.    Not surprisingly, an analysis conducted by UN investigators also revealed that, throughout the Programme, there were significant instances of intentional above-market pricing of goods, with the price gap widening as the Programme continued.

241.    Often, the goods pricing was increased artificially in order to cover the Transport Fees and Service Fees, thus permitting suppliers, including AWB, to be reimbursed from the Escrow Account for the illicit payments.

242.    The UN investigators' conclusions are consistent with a September 12, 2003 report generated by the United States Defense Contract Audit Agency and Defense Contract Management Agency ("DCAA Report").

243.    In order to prepare recommendations for prioritizing and renegotiating contracts following the U.S. invasion of Iraq in 2003, the DCAA Report analyzed the pricing of 759 already-approved and funded contracts.

244.    The analysis revealed potential overpricing in forty-eight percent (48%) of the contracts, totaling approximately $656 million. The DCAA Report indicated that the actual overpricing figure could have been higher because the DCAA Report had been unable to form conclusions on forty-four (44) contracts valued at $1.1 billion.

245.    The DCAA Report further concluded that the most consistently overpriced contracts were food commodity contracts, eighty-seven percent (87%) of which were found to be overpriced, on average by twenty-two percent (22%) of the contract value.

246.    The DCAA Report specifically noted a December 11, 2002 contract between AWB and the IGB in which AWB had sold 500,000 metric tons of wheat to Iraq for a total price of $135,382,046. The DCAA Report found potential overpricing of $14,827,046 (or 11%) for that contract.

## ALIA: A FRONT COMPANY TO FACILIATE KICKBACK PAYMENTS

247.    Alia was established in August 1994 as a joint venture between Iraqi businessman Hussain Al-Khawam and Iraq's Transportation Ministry. The arrangement developed from Al-Khawam's proposal that Alia refurbish Iraqi vessels stranded off the coast of Jordan and use them for commercial shipping.

248.    At the time of Alia's registration, Jordanian law required that at least one owner of a Jordan-registered company be a Jordanian national. Accordingly, Al-Khawam nominated his associate, Mo'tasset Fawzy Qatishat, to hold fifty-one percent (51%) of the company's shares on Al-Khawam's behalf, while the Iraqi Transportation Ministry assigned two of its employees to hold Alia's remaining shares.

249.    In 1999, the Iraqi Transportation Ministry arranged for Alia to act as ISCWT's collection agent for suppliers' payments of Transport Fees related to goods shipped to Umm Qasr. For that role, Alia received a small commission.

250.    Alia began receiving Transport Fees payments as early as March 2000.

251.   Alia's actions violated, or assisted in the violation of, the Programme, which prohibited any third party from engaging in financial transactions with the Iraqi government outside of the Programme's confines or the relevant Security Council resolutions.

252.   As alleged below, the bribe payments also violate the following predicate acts of RICO: (a) 18 U.S.C. § 1952 (Travel Act); (b) 18 U.S.C. § 1956 (money laundering); (c) 18 U.S.C. § 1957 (monetary transactions involving unlawfully derived property); (d) 15 U.S.C. §§ 78dd-1 *et seq.* (Foreign Corrupt Practices Act); and (e) 50 U.S.C. § 1701 *et seq.* (International Emergency Economic Powers Act), including violations of 31 C.F.R. Part 575 (Iraqi Sanctions Regulations).

253.   Alia's illegal conduct, in combination with that of the defendants, violated the aforementioned predicate acts because Alia and the defendants knowingly, intentionally, or recklessly engaged in transactions that had the effect of evading or violating U.S. law prohibiting the transfer, directly or indirectly, of funds or other financial or economic resources to the government of Iraq.

254.   Alia and the defendants used the facilities of interstate or foreign commerce and transmitted or transferred criminally-derived property and funds from a place in the United States to or through a place outside of the United States and concealed the nature of their unlawful activity.

255.   AWB's illegal payments to Alia (nominally a Jordanian company) rather than ISCWT or other Iraqi governmental entities, demonstrate that it - in conspiracy with the Hussein Regime - intentionally or recklessly disguised the illicit nature of the bribery payments.

256.    Indeed, all transportation services for which Alia received payment from suppliers was, in fact, provided by Iraqi government employees. Transport of goods arriving at Umm Qasr was provided by trucks from the Transportation Ministry or the IGB.

257.    When asked by UN investigators whether the fees Alia paid to ISCWT were used for actual transportation costs, Alia's general manager stated: "There were no actual costs. The driver got maybe $10. **This was a payment to the Government of Iraq**." (Emphasis added)

258.    When contract negotiations between a supplier and an Iraqi purchasing body concluded, ISCWT contacted Alia and informed it of the amount Alia was to receive from the supplier.

259.    On some occasions, ISCWT contacted a suppler directly and informed it to send payment to Alia, or sent the same invoice to the supplier that it had sent to Alia. On other occasions, Alia sent invoices to suppliers indicating the amounts levied by ISCWT.

260.    ISCWT representatives came to Alia's office monthly to inspect its records, and also sent an employee to work at Alia.

261.    Suppliers paid their kickbacks in various foreign currencies (not Iraqi dinars) to Alia's accounts at Jordan National Bank and the Egyptian Arab Land Bank. Upon receipt of payment, Alia advised ISCWT of the payment amount and the corresponding supplier, contract, ship, and LC.

262.    Shortly after sending such communications, Alia transferred the full payment amount (minus a commission between one-quarter percent (1/4%) and one percent (1%) of the payment) to ISCWT's account at al-Rafidain Bank in Amman, Jordan. For these transfers, Alia used accounts in various foreign exchange currencies, including U.S. dollars.

263.   In total, between March 2000 and December 2003, the bribery payments passing through Alia's accounts in Jordan National Bank totaled more than **$788 million (U.S.) dollars**.

## AWB'S ROLE IN THE
## UNLAWFUL CONSPIRACY AND ENTERPRISE

264.   AWB is the exclusive manager and marketer of all Australian bulk wheat exports through a supply pooling system with Australian wheat growers.

265.   AWB was the largest humanitarian goods supplier participating in the Programme ($2.3 billion in Programme sales) and accounted for more than 14% of the more than $1.5 billion in illegal kickback payments made to Iraq in connection with humanitarian goods imported under the Programme.

266.   During each Programme phase, AWB negotiated several contracts with the IGB for up to several hundred thousand metric tons of wheat per contract.  Each contract usually required up to ten or more individual shipments in ocean freighters from Australia to Umm Qasr.

267.   As noted *supra*, whereas for the first five phases of the Programme, AWB's contracts required shipment of wheat only up to the point of entry of Iraq (Umm Qasr), beginning in June 1999, AWB assumed responsibility for the inland transportation of wheat inside Iraq from the Umm Qasr port ("CIF Free on Truck to Silo All Governorates via Umm Qasr Port.") and to pay a $12 p-m-t "discharge" fee.

268.   According to AWB, these contractual changes, which became standard in all AWB contracts for the remainder of the Programme, were mandated by the IGB.

269.    However, AWB did not have its own trucking fleet in Iraq. As alleged *supra*, the transportation of goods from Umm Qasr to inland destinations inside of Iraq was, in fact, provided by Iraqi government employees (and not AWB or Alia).

270.    And, as alleged *supr*a, AWB could not directly pay Iraq or an Iraqi company for inland transportation costs without violating UN sanctions and the Programme's rules, both of which allowed financial transactions with Iraq and Iraqi entities only through the Escrow Account in New York.

271.    In violation of those standards (as well as money laundering statutes, the FCPA, and IEEPA), AWB paid Transport Fees to Alia, which as previously noted, was an Iraqi front company that served as a collection agent for the illicit kickbacks suppliers paid to Iraq.

272.    In 1999 alone, AWB entered into at least 4 transactions with Iraq that mandated AWB's payment of Transport Fees bribes to the Hussein Regime.

273.    AWB made the payments to Alia in several ways. Sometimes, AWB paid Alia directly. At other times, fearing that a direct payment to Alia would reveal that the payments were, in fact, bribes to Iraq, AWB made its payments to Alia through third party shipping companies.

274.    In paying the bribes in this more indirect manner, AWB intended to distance itself from payments that it knew, or was reckless in its failure not to know, were illegal.

275.    The fact that certain shipping companies refused to perform these services for AWB because they considered such actions in possible violation of the Programme, and possibly illegal, further put AWB on notice of the impropriety that they were engaged in.

276.    AWB also utilized an English trading company, Ronly Holdings Limited ("Ronly"), to facilitate illegal payments and serve as an additional "buffer" between AWB and

the Hussein Regime. Thus, AWB delivered payments of the illegal kickbacks to Ronly, which transferred them to the shipping companies, which in turn passed the bribes on to Alia.

277.    As noted *supra*, there was no commercially valid rationale for the use of third party shipping companies or Ronly to make payments to Alia. AWB made payments through those mechanisms to disguise the fact that it was making kickback payments it knew were illegal.

278.    Transport Fees for AWB's first three contracts, which were signed in July 1999, were $12 p-m-t. In 2000, Transport Fees increased to between $14 and $15 p-m-t. From 2001 to the spring of 2003 Transport Fees (combined with Service Fees) rocketed to between $45 and $56 p-m-t.

279.    The staggering increase in Transport Fees plainly evidences that AWB's payments did not reflect actual commercial transportation rates, but were in fact revenue-generating kickbacks for Iraq, which AWB disguised in order to avoid detection by the 661 Committee.

280.    As alleged in greater detail *infra*, had it been complying with its obligations and industry standards, AWB's Transport Fee payments must have raised red flags for BNP, who should have questioned and investigated the payments, and subsequently rejected them.

281.    However, because BNP itself profited by financing unauthorized oil purchasers who were, themselves, paying illegal bribes (in the form of "surcharges") to the Hussein Regime, BNP intentionally, knowingly, or with reckless disregard, allowed AWB and other humanitarian goods suppliers to continue fueling the Kickback Scheme with millions of dollars of secret bribes.

282.     The sharp increase in AWB's Transport Fees coincided with the introduction of Iraq's Service Fees scheme in the second half of 2000.

283.     For example, AWB paid approximately $14 p-m-t for wheat shipped on a contract executed in July 2000. As alleged *supra*, between August and November 2000, Iraq increased its demands for kickbacks from goods suppliers in accordance with official memoranda issued from high-level Iraqi officials. After these changes were effectuated, AWB's next contract, signed in November 2000, contained Transport Fees more than twice the amount of what had been charged previously.

284.     Iraq's former Minister of Trade, Mohammad Mehdi Saleh, informed UN investigators that AWB paid Service Fees on all contracts where such kickbacks were levied.

285.     As alleged *supra*, AWB's Service Fees were often "bundled" into the pre-existing Transport Fees, leading to large increases in the inland transportation costs that ISCWT, Alia (and other Iraqi front companies) demanded in 2001 and 2002.

286.     Records from Iraq's Transportation Ministry concerning the distribution of bribe payments received by Alia indicate that AWB's remittances to Alia contained Service Fees components. One example, discussed *supra*, was the shipment to Umm Qasr on the *Bei Hai* vessel.

287.     Because the Transport Fees levied by the Transportation Ministry remained constant at $25 p-m-t, the Service Fees component of AWB's kickbacks via Alia, on information and belief, ranged from $20 to $31 p-m-t.

288.     AWB never advised the UN that it was paying Alia for any inland transportation costs.

289.    When the costs of inland transportation were first included in AWB's contracts in Phase VI, the first several contracts submitted for the UN's review and approval advised that payments of a "discharge cost" of up to $12 p-m-t would be paid to unnamed "Maritime Agents." These contracts made no mention of "inland transportation" fees.

290.    AWB's deception was even more blatant for contracts awarded for Phase VII and afterward. These contracts did not disclose the payment of "Maritime Agents," or disclose the amount of such payments (as it had in the earlier contracts), even as the proportion of contract price attributable to Transport Fees increased dramatically over time.

291.    In total, AWB paid over $221.7 million in kickbacks. This constitutes more than **fourteen percent (14%)** of the illicit bribes collected by the Hussein Regime under the Kickback Scheme.

### THE TRUTH ABOUT AWB'S ILLEGAL CONDUCT IS REVEALED

292.    In the course of the subsequent UN investigation, as well as a separate investigation conducted by the Australian government, AWB claimed that: (a) it believed Alia provided actual transport services; (b) it did not know that Alia was partially owned by the Iraqi government; and/or (c) it did not know that payments by AWB to Alia were channeled to the Hussein Regime. AWB's defense of its money laundering, bribery and violation of U.S. and UN requirements is demonstrably false.

293.    Numerous documentary and circumstantial red flags demonstrate that AWB knew, or recklessly disregarded, that paying Alia illicitly funded the Iraqi regime.

294.    First, AWB and Alia's relationship bore no semblance to an ordinary, arms-length commercial relationship. AWB did not select Alia to provide transport services. Instead, as AWB has acknowledged, the IGB selected Alia to provide such services. Moreover, AWB

made the requested payments to Alia according to a non-negotiable, unilaterally-presented fee schedule that was issued to AWB for each phase of the Programme. As former senior AWB officials later admitted to UN investigators, AWB did not initiate discussions or negotiate any contract with Alia for Alia's purported provision of inland transportation services.

295.    Given the sharp increase in transport prices and AWB's overall commitment of more than $200 million in fees to Alia, there is no commercially reasonable explanation for AWB's failure to enter into a formal contract with Alia, or its failure to engage in meaningful negotiations with Alia regarding the price and terms of the "services" that Alia provided.

296.    AWB claimed that it did not contest the dramatic price increases because the changes were "revenue neutral"; i.e., the kickbacks could be incorporated into the contract price and recovered by AWB from the Escrow Account in New York. While AWB may not have had a financial interest in challenging the price increases for the illegal payments paid to the Hussein Regime, it nevertheless knew, or recklessly disregarded, that these increases had, in fact, occurred.

297.    AWB's knowledge of these increases and of the fact that Iraq had mandated payment to Alia for shipping "services," clearly put AWB on notice that the increases in Transport Fees benefited the Hussein Regime.

298.    Second, AWB knew or willfully blinded itself to the fact that the price for Alia's transport services was determined by the Iraqi government, not Alia.

299.    In fact, Michael Long, AWB's General Manager for International Sales and Marketing, confirmed to UN investigators that he had known that Iraq's Transportation Ministry established the price for Alia's inland transportation charges.

300.    The Transportation Ministry's role in establishing Alia's prices clearly alerted AWB to the likelihood that the Iraqi government benefited from AWB's unapproved payments of Transport Fees to Alia.

301.    Third, other than letters Alia sent to AWB suggesting that Alia was in the business of providing transportation services, there was no other documentation describing the logistical details of the transportation services Alia supposedly rendered.

302.    There were also no communications describing the types of logistical challenges that would ordinarily arise during the course of efforts to truck millions of tons of wheat through the Iraqi countryside, and providing it to Class members in the northern governorates.

303.    Indeed, during a visit to AWB's corporate headquarters in February and March 2005, UN investigators reviewed approximately 25,000 records concerning AWB's participation in the Programme, including records related to AWB's payments to Alia. Despite a request to disclose records detailing logistical issues relating to trucking services (which Alia supposedly provided), AWB only furnished the UN with documents concerning problems AWB had had loading and unloading ships.

304.    Fourth, AWB received numerous documents from Alia and the Iraqi government that led AWB to know, or recklessly disregard, that payments made by AWB to Alia were in fact made to (or for the benefit of) ISCWT.

## Communications Among AWB, Alia, Ronly And The IGB

305.    For example, in a November 24, 1999 facsimile from Alia to AWB, Alia advised AWB that it had received a complaint from ISCWT that AWB had not timely paid Transport Fees for a wheat shipment arriving on the vessel "Pretty Ruby." Alia advised AWB:

> As you are aware, the renitance [sic] in question should the [sic] received here Five days prior to vessel's arrival at Um Qaser [sic], therefore you are