UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                             :

HANA AHMED KARIM, et al.,         :

                             :

                Plaintiffs,      :

                             :         06 Civ. 15400 (GEL)

      -v.-                      :

                             :        **OPINION AND ORDER**

AWB LIMITED, BNP PARIBAS, AWB (U.S.A.)  :
LIMITED, and COMMODITY SPECIALISTS
COMPANY,                  :

                             :

                Defendants.    :

                             :
------------------------------------------------------------x

Kevin P Roddy and Daniel R. Lapinski, Wilentz,
Goldman & Spitzer, P.A., Woodbridge, PA; Joshua
D. Glatter, Gary M. Osen, Ari Ungar, and Ellyn
Essig, Osen LLC, Oradell, NJ; James P. Bonner,
Shalove, Stone, Bonner & Rocco LLP, New York,
NY; C. Tab Turner, Turner & Associates, P.A.,
North Little Rock, AR; Jay Nelkin, Nelkin &
Nelkin P.C., Houston, TX, <u>for plaintiffs</u>.

Robert H. Baron and Timothy G. Cameron,
Cravath, Swaine & Moore LLP, New York, NY,
<u>for AWB Limited and AWB (U.S.A.) Limited</u>.

Robert S. Bennett, Alan Kriegel, Jennifer L.
Spaziano, and William J. O'Brien III,
Skadden, Arps, Slate, Meagher & Flom LLP
Washington, DC, and New York, NY,
<u>for BNP Paribas</u>.

Elliot G. Sagor, Eric J. Stock, and Craig L.
Lowenthal (Ty Cobb, of Counsel), Hogan &
Hartson LLP, New York, NY,
<u>for Commodity Specialists Company</u>.

GERARD E. LYNCH, District Judge:

Plaintiffs are Iraqi citizens who were intended beneficiaries of the United Nations Oil-for-Food Programme (the "OFP").  They allege that defendants AWB Limited ("AWB"), AWB (U.S.A.) Limited ("AWB USA"), BNP Paribas ("BNP"), and Commodity Specialists Company ("Commodity Specialists") conspired with the Saddam Hussein regime to siphon money from the OFP in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d), and 1964(c), the International Emergency Economic Powers Act (the "IEEPA"), 50 U.S.C. §§ 1701 et seq., the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. §§ 78dd-1 et seq., and the common law of New York.  Defendants have moved to dismiss plaintiffs' claims in their entirety.  For the following reasons, defendants' motions will be granted.

## BACKGROUND

In 1990, the United Nations Security Council adopted Resolution 661, imposing comprehensive economic sanctions on Iraq in response to its invasion and occupation of Kuwait. (Compl. ¶ 57.)  In addition to sharply limiting trade, the resolution prohibited all financial transactions with any person or entity in Iraq.  (Id. ¶¶ 57, 68-69.)  In 1995, the Security Council adopted Resolution 986, creating the OFP to permit the export from Iraq of oil for the limited purpose of purchasing humanitarian goods and supplies.  (Id. ¶¶ 70, 72.)  The purpose of the resolution was to alleviate the hardships ordinary Iraqis suffered under the sanctions by making available additional humanitarian goods.  (Id. ¶¶ 70, 72.)  The resolution ordered the creation of an escrow account, into which purchasers of Iraqi oil would deposit payment and from which sellers of authorized goods would receive payment.  (Id. ¶ 72.)  However, the resolution kept in

2

place the prohibition on financial transactions with Iraq outside of the OFP. (Id. ¶ 74.) Goods bought under the OFP were to be distributed to the Iraqi people according to a UN-approved distribution plan. (Id. ¶¶ 88, 96.) Between 1997 and 2003, Iraq sold $64.2 billion in oil and bought approximately $34.5 billion in food, medicine, equipment, and other goods under the OFP. (Id. ¶¶ 75, 496-97.)

AWB is an Australian corporation that sold wheat to Iraq under the OFP. (Id. ¶¶ 29, 32.) AWB USA is the U.S. subsidiary of AWB, and Commodity Specialists is a U.S. agricultural trading company that sold wheat to Iraq in collaboration with AWB. (Id. ¶¶ 34, 35.) BNP is a French bank that was responsible for administering the OFP escrow account. (Id. ¶¶ 37-38.)

Starting in 1999, the Hussein regime began demanding that humanitarian goods suppliers, including AWB, pay "inland transport" and other service fees to the Hussein regime as a condition for their continued sales to Iraq under the OFP. (Id. ¶¶ 106, 110-11.) Plaintiffs allege that the payments by AWB and other suppliers of such fees were in fact kickbacks intended to transfer funds to the Hussein regime in violation of the UN sanctions. (Id. ¶ 140.) In total, plaintiffs allege that humanitarian goods suppliers, including AWB, paid at least $1.5 billion in such kickbacks to the Hussein regime. (Id. ¶ 104.) Plaintiffs allege that AWB USA, Commodity Specialists, and BNP collaborated in and/or facilitated the payment of kickbacks by AWB and other suppliers to the Hussein regime. (Id. ¶¶ 34, 35, 38.)

Plaintiffs bring this action on behalf of themselves and a class of Iraqi citizens from the three northern governorates of Iraq who were intended beneficiaries of the OFP. (Id. ¶¶ 3-4.) They allege that because defendants used funds from the OFP to pay kickbacks to the Hussein regime, there were fewer funds available to purchase humanitarian goods, and plaintiffs thus did

not receive the benefits they otherwise would have received.  (Id. ¶¶ 13-15.)  They allege that

defendants' actions violated RICO, the IEEPA, the FCPA, and the common law of New York.

(Id. ¶ 2.)

## DISCUSSION

Defendants argue that the Court lacks jurisdiction to hear plaintiffs' claims because

plaintiffs have not satisfied the standing requirements of Article III.  This is a "threshold

question that must be resolved . . . before proceeding to the merits."  Steel Co. v. Citizens for a

Better Environment, 523 U.S. 83, 88-89 (1998).  Article III limits the judicial power of federal

courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, which the Supreme Court has

interpreted to mean "cases and controversies of the sort traditionally amenable to, and resolved

by, the judicial process."  Steel Co., 523 U.S. at 102.  The standing requirement thus helps

ensure that federal courts respect "the proper – and properly limited – role of the courts in a

democratic society."  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006).

The standing requirement has three components: (1) that plaintiff has suffered an "injury

in fact"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; (3) that

it is "likely" that the injury will be "redressed by a favorable decision."  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560-61 (1992).  The test for standing "focuses on whether the plaintiff is

the proper party to bring this suit."  Raines v. Byrd, 521 U.S. 811, 818 (1997).  In so doing, it

ensures that the questions presented to a court are resolved "not in the rarified atmosphere of a

debating society, but in a concrete factual context conducive to a realistic appreciation of the

consequences of judicial action."  Valley Forge Christian College v. Americans United for

Separation of Church and State, Inc., 454 U.S. 464, 472 (1982).  Requiring that the person

seeking relief allege "a personal stake in the outcome of the controversy" helps to ensure the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." Flast v. Cohen, 392 U.S. 83, 99 (1968). It also shows "due regard for the autonomy of those persons likely to be most directly affected" by a court's action by putting "the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." Valley Forge Christian College, 454 U.S. at 473.

Just as importantly, the standing inquiry helps maintain "the tripartite allocation of power set forth in the Constitution." Cuno, 547 U.S. at 341. It ensures that the judicial branch's power to review – and potentially overturn – the decisions of the executive and the legislative branches is employed only "in the last resort, and as a necessity." Allen v. Wright, 468 U.S. 737, 752 (1984). As Chief Justice Marshall observed once in a speech to the House of Representatives:

> If the judicial power extended to every *question* under the constitution it would involve almost every subject proper for legislative discussion and decision; if to every *question* under the laws and treaties of the United States it would involve almost every subject on which the executive could act. The division of power [among the branches of government] could exist no longer, and the other departments would be swallowed up by the judiciary.

Cuno, 547 U.S. at 341 (alteration in original), quoting 4 Papers of John Marshall 95 (C. Cullen ed. 1984). Consequently, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 37 (1976).

Defendants argue that plaintiffs lack standing because they have not alleged that they have suffered an "injury in fact." To satisfy the injury in fact requirement, a plaintiff must allege

an invasion of a legally protected interest that is (a) "concrete and particularized" and (b) "actual or imminent." Lujan, 504 U.S. at 560. To be "concrete and particularized," an "injury must affect the plaintiff in a personal and individual way." Id. at 560 n.1. That is, "standing cannot be predicated upon an injury the plaintiff suffers in some indefinite way in common with people generally." Lance v. Coffman, ___ U.S. ___, 127 S. Ct. 1194, 1197 (2007) (per curiam). "Even in a proceeding which he prosecutes for the benefit of the public the plaintiff must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens." Id. A generalized grievance is not sufficient for Article III because of "the necessarily abstract nature of [an] injury all citizens share." Id. at 1198.[1]

For his injury to be "actual or imminent," a plaintiff must show "that he has sustained or is immediately in danger of sustaining some direct injury." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). The injury cannot be "conjectural or hypothetical." Lujan, 504 U.S. at 560.

---

[1] The requirement that a plaintiff's injury be "personal," "individualized" and "peculiar to himself" does *not* mean that a plaintiff must allege injuries that affect only him, or that there is some upper limit on the number of people that may be injured by a defendant's acts beyond which there is no standing. This plainly cannot be the case. In Baker v. Carr, 369 U.S. 186 (1962), for example, plaintiffs sued "on their own behalf and on behalf of all qualified voters . . . of the State of Tennessee who are similarly situated," seeking to overturn an apportionment law that underrepresented voters in certain counties in the state. Id. at 204-05. The underrepresentation caused by the malapportionment was not "peculiar" to one or even a few individuals, but instead affected a great number of plaintiffs' fellow citizens. Nevertheless, the Court held that plaintiffs had standing to sue because plaintiffs had alleged "facts showing disadvantage *to themselves as individuals*," namely the dilution of each plaintiff's vote. Id. at 206 (emphasis added). Thus, the key is not how many people are affected by a defendant's acts, but whether the injuries that result disadvantage plaintiffs "as individuals" or only by virtue of their membership in a larger group. "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" Federal Election Com'n v. Akins, 524 U.S. 11, 23-24 (1998) (holding that plaintiffs' inability to get government information to which they were legally entitled was "sufficiently concrete and specific" despite being "shared in substantially equal measure by all or a large class of citizens").

If the injury a plaintiff alleges has not already been sustained, the threat of future injury must be "sufficiently real and immediate [so as] to show an existing controversy." Lyons, 461 U.S. at 103. "Allegations of possible future injury do not satisfy the requirements of Art[icle] III." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).

Thus, in Cuno the Supreme Court rejected a challenge by residents of Toledo, Ohio, to a tax break granted by state and local officials to DaimlerChrysler to encourage it to expand an automobile assembly plant. 547 U.S. at 338-39. Plaintiffs' alleged injury was that the tax break "deplete[d] the funds of the State of Ohio to which the Plaintiffs contribute through their tax payments and thus diminishe[d] the total funds available for lawful uses and impose[d] disproportionate burdens on them." Id. at 342-43. The Court held that plaintiffs lacked standing to challenge the tax break. Any injury to the funds of the State of Ohio was not "concrete and particularized" because plaintiffs' interest in such moneys was an interest "shared with millions of others," not an interest particular to plaintiffs as individuals. Id. at 343-44. Any alleged injury to plaintiffs as individuals – i.e., through higher future taxes they might pay, or fewer future public benefits they might receive – was not "actual or imminent" because it was based on conjectures about whether the lost revenues would, in fact, end up affecting plaintiffs, or whether the lost revenues would be recouped in a way that did not affect plaintiffs. Id. at 344-45. "[T]he interests of a taxpayer in the moneys of the [government] treasury are too indeterminable, remote, uncertain and indirect to support standing." Id. at 345.[2]

---

[2] Cuno is consistent with the long line of cases holding that payment of taxes does not give a person standing to challenge the way in which public funds are spent. See Hein v. Freedom From Religion Foundation, Inc., ___ U.S. ___, 127 S. Ct. 2553, 2563 (2007) ("As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable 'personal injury'

The foregoing makes it plain that plaintiffs lack standing in this case.  Plaintiffs allege

that escrow account funds were "siphoned" off and "improperly transferred into the coffers of

the Hussein Regime."  (Compl. ¶ 15.)  But the escrow account did not belong to any of the

plaintiffs individually; rather, it was a UN-administered account earmarked for "the

humanitarian needs of the Iraqi population" as a whole.  S.C. Res. 986 ¶ 8, U.N. Doc. S/RES/986

(April 14, 1995).  To the extent that the injury plaintiffs allege is the illegal depletion of these

funds, they have alleged an injury that they "suffer[ed] in some indefinite way in common with"

all Iraqis who were supposed to benefit from the escrow account.  Lance, 127 S. Ct. at 1197.

They have not alleged – nor can they – that the depletion of the escrow account funds injured

them "in a personal and individual way."  Lujan, 504 U.S. at 560 n.1.  Their allegations are like

those of the plaintiffs in Cuno, that the unlawful actions of defendants "diminishe[d] the total

funds available" to everyone.  547 U.S. at 342-43.  As in Cuno, this is not sufficient to establish

a "concrete and particularized" injury to plaintiffs individually.

To the extent that the injury plaintiffs allege is that they received fewer benefits than they

would have had there been no kickback scheme, they have failed to allege an injury that is

"actual or imminent."  It is certainly possible – though plaintiffs do not specifically allege it –

that the payment of illegal kickbacks out of the escrow account meant that the Hussein regime

---

required for Article III standing."); Valley Forge Christian College, 454 U.S. at 485 n.20
(rejecting argument that standing may be premised upon claim that the government "has
exceeded the bounds of the law in allocating its largesse"); Doremus v. Board of Ed. of Borough
of Hawthorne, 342 U.S. 429, 433 (1952) ("[T]he interests of a taxpayer in the moneys of the
federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an
appeal to the preventive powers of the Court over their manner of expenditure.").  The Court has
recognized a "narrow exception" to this general prohibition in allowing taxpayers to sue, under
certain circumstances, for the expenditure of funds in violation of the Establishment Clause.
Hein, 127 S. Ct. at 2564.

distributed fewer humanitarian goods to plaintiffs than it otherwise would have done.  But it is also possible that the Hussein regime sold more oil than it otherwise would have in order to pay for the kickbacks, or that the amount of goods distributed was dictated by the UN-approved distribution plan (Compl. ¶¶ 88, 96), rather than by the amount of funds available in the escrow account.  That $64.2 billion in oil proceeds were deposited into the escrow account, compared with $34.5 billion spent on humanitarian goods purchases and $1.5 billion on kickbacks (id. ¶¶ 75, 104, 496-97), suggests that something other than the escrow account balance was the constraint on the amount of humanitarian aid distributed by the Hussein regime.  Moreover, even if the kickbacks diminished the amount of goods distributed to Iraqis overall, there is no allegation that the benefits plaintiffs themselves received was affected.  For all of these reasons, whether or not the payment of kickbacks actually caused the plaintiffs to receive fewer benefits is a matter of speculation and conjecture, and not an injury that was "actual" or "imminent."

Plaintiffs dispute this by arguing that they had an "entitlement" to the escrow account that made its diminishment an injury to their "protected property interest."  (Pl. Opp'n to BNP 15.)  They rely principally on United States v. Chalmers, 474 F. Supp. 2d 555 (S.D.N.Y. 2007), which addressed the sufficiency of a criminal indictment for wire fraud, under 18 U.S.C. § 1343, by companies alleged to have engaged in an OFP kickback scheme similar to that alleged here. Id. at 559-60.  Defendants argued that any diversion of OFP escrow account funds was not wire fraud because the statute requires that "property" be the object of the wire fraud scheme, and "the Iraqi people" did not have "a valid property interest in the funds allegedly diverted" from the escrow account.  Id. at 560.

The Chalmers court rejected the argument.  It looked to Due Process Clause cases, which have held that a recipient of public benefits has a property interest in those benefits where the statutes or regulations conferring the benefit "meaningfully channel official discretion by mandating a defined administrative outcome."  Id. at 563, quoting Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005).  The court found that Resolution 986 did meaningfully channel official discretion in directing that the escrow account "*shall* be used to meet the humanitarian needs of the Iraqi population," and that "Iraq effectively *guarantees* their equitable distribution." Chalmers, 474 F. Supp. 2d at 563 (emphasis in original), quoting Resolution 986 ¶¶ 8, 8(a)(ii). Likewise, the memorandum of understanding between the UN and the Government of Iraq stated that the latter "shall provide a Distribution Plan . . . with a view to *ensuring* [an equitable] distribution."  Chalmers, 474 F. Supp. 2d at 563.  The court concluded that "this language is sufficient for the Iraqi People as a whole to lay a claim of entitlement to the funds used to buy humanitarian goods under the [OFP]," and therefore that the government could proceed in its prosecution of defendants for wire fraud.  Id.

Plaintiffs' appeal to Chalmers is misplaced.  Even assuming that reliance on a case interpreting a criminal wire fraud statute (that in turn relies on cases interpreting the Due Process Clause) is appropriate for interpreting Article III standing, the holding in Chalmers does not support the proposition that plaintiffs here had a property interest in the escrow account funds. Chalmers held that "the Iraqi People as a whole" had a property interest in the escrow account funds, not that any individual Iraqis had such a property interest.  Resolution 986 and the MOU "meaningfully channel official discretion" to the extent that they required Iraq to use the funds for the benefit of "the Iraqi population" and to do so "equitabl[y]."  By contrast, an individual

10

has a property interest in a public benefit only where the relevant statute or regulation "dictates [a] particular result as to *any given benefits applicant*." Kapps, 404 F.3d at 113 (emphasis added). Chalmers did not hold that Resolution 986 or the MOU dictated a particular result with respect to individual Iraqis because for purposes of establishing that defendants had criminally schemed to acquire "property," it was sufficient that the escrow account was "property" of someone or something, even if it was not the property of any specific individual Iraqis. Plaintiffs have not alleged, and it does not appear to be the case, that either Resolution 986 or the MOU "dictate[d] a particular result" as to any given Iraqi beneficiary of the OFP.[3] Hence, they have failed to establish that any given Iraqi has a property interest in the escrow account funds.[4]

---

[3] In the complaint, plaintiffs do allege that the Hussein regime introduced a rationing program in 1990 under which "each man, woman and child residing in Iraq was entitled to a complete monthly supply of food rations" designed to provide 2,470 calories per day. (Compl. ¶¶ 82-83.) But the relevance of this "entitlement" is unclear, as plaintiffs do not allege any connection between the rationing program and the OFP, except to say that the rationing "continued" after the OFP was introduced in 1996. (Id. ¶ 78.) Its existence does not transform plaintiffs' otherwise general grievance about the use of escrow account funds into a "concrete and particularized" injury. In any event, plaintiffs' opposition to defendants' motions abandons the rationing program as a basis for finding that they were entitled to a specific share of the escrow account funds.

[4] Plaintiffs' allegation that "thirteen percent (13) percent of Escrow Account funds were specifically allocated for the three Iraqi northern governorates" (Compl. ¶ 73) does not make their asserted injury any more "concrete and particularized," even if this would make it possible to calculate the share of expropriated escrow account funds attributable to the three northern governorates. Plaintiffs purport to represent a class of all Iraqi citizens from these three governorates (Compl. ¶ 46), but plaintiffs themselves are individual Iraqis, and they must allege that the injury each of them suffered is "concrete and particularized," not that the injury suffered by the class as a whole is. "That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Lewis v. Casey, 518 U.S. 343, 357 (1996). If no individual plaintiff can assert an injury that is "concrete and particularized," plaintiffs lack standing to assert claims on their own behalf as well as on behalf of other purported class members. "[A] plaintiff may not use the procedural device of a class

Plaintiffs' reliance on <u>Northeastern Florida Chapter of Associated Gen. Contractors of America v. City of Jacksonville</u>, 508 U.S. 656 (1993), and <u>Turner v. Fouche</u>, 396 U.S. 346 (1970), is also misplaced.  In these cases, the Supreme Court held that a plaintiff had standing to assert a claim under the Equal Protection Clause, even if he could only demonstrate that he lost an opportunity to receive a government benefit, rather than the government benefit itself.  <u>See</u> <u>Jacksonville</u>, 508 U.S. at 666 (award of government contracts); <u>Turner</u>, 396 U.S. at 362 (appointment to board of education).  However, the outcome in these cases turned on the special nature of an equal protection injury, rather than the requirements for Article III standing generally.  "The 'injury in fact' *in an equal protection case* of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." <u>Jacksonville</u>, 508 U.S. at 666 (emphasis added).  The Supreme Court has elsewhere noted that non-economic and non-physical injuries such as the denial of equal protection of the laws can provide a basis for standing, but that the decision to recognize such "intangible" injuries must be made on a "case by case" basis.  <u>Hein</u>, 127 S. Ct. at 2587 (Souter, J., dissenting).  Plaintiffs provide no basis – and the Court finds none – for holding that the intangible harm of *possibly* not receiving additional public benefits because of a general depletion of public funds (as opposed to being invidiously excluded from eligibility for benefits based on one's membership in a protected class) is an injury that courts should recognize.

---

action to bootstrap himself into standing he [otherwise] lacks." <u>German v. Federal Home Loan Mortg. Corp.</u>, 885 F. Supp. 537, 548 (S.D.N.Y. 1995).  In short, reducing the sweep of the class from "all the people of Iraq" to "all the people of a particular subsection of Iraq" does nothing to change the basic problem of standing, particularly where the injury claimed is shared with *all* the Iraqi people and is not particular to the people residing in the northern governorates.

Plaintiffs' alleged injury is a decrease in the escrow account funds that were available to purchase humanitarian goods for the Iraqi population. To the extent that they seek to vindicate the rights "of the Iraqi population" to those funds, they have alleged an injury that is too general and abstract to be judicially cognizable. To the extent that they seek to vindicate their right to a hypothetical share of such funds, they have alleged an injury too uncertain and conjectural. Denying standing to plaintiffs asserting such claims serves the administration of justice by preventing the Court from adjudicating disputes where the issues are not suitably concrete, and from encroaching on domains better left to legislative and executive bodies. Accordingly, plaintiffs do not have standing to pursue their claims for relief in federal court, and this Court lacks jurisdiction to hear them.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted and plaintiffs' complaint is dismissed in its entirety.

SO ORDERED.

Dated: New York, New York
September 30, 2008

GERARD E. LYNCH
United States District Judge

13